**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MELISSA BEDIAKO** | : | |
| *Plaintiff* | : | |
| v. | : | Civil Action No. RWT 11-001 |
| **AMERICAN HONDA FINANCE CORPORATION** | : | |
| | : | |
| *Defendant.* | | |

**MEMORANDUM OPINION**

This is a purported class action seeking damages and other relief on behalf of the Plaintiff and others similarly situated for allegedly deficient sales of repossessed automobiles in violation of Maryland Law. As explained below, the Court concludes that the Complaint is, in a reversal of the usual formulation, both "too late" and "too little."

**I. Background**

*A. Summary of Facts*

On April 3, 2004, the Plaintiff, Melissa Bediako ("Bediako"), purchased a used 1999 Acura TL in Montgomery County, Maryland, from Ourisman Bethesda, Inc., d/b/a Ourisman Honda. *See* Compl., ECF No. 1 ¶ 21. She obtained financing for the purchase by executing a Retail Installment Sale Contract ("RISC"). *Id.* ¶ 23; *see also* Defs. Mot. to Dismiss, Aff. Kevin P. Farrell, Ex. 1 RISC Contract, ECF No. 3-2 at 3-4. The RISC contains a provision that affirmatively elects to have the agreement governed by Subtitle 10 of Title 12 of the Commercial Law Article of the Annotated Code of Maryland, a subtitle that contains Maryland law governing credit grantor closed end credit agreements. Compl., ECF No. 1 ¶ 24. This subtitle is commonly

referred to as "CLEC."  The RISC was subsequently assigned to the Defendant, American Honda Finance Corp. ("Honda Finance").   *Id.* ¶¶ 26 & 27.

Bediako fell behind in required payments, and her car was repossessed on or before April 28, 2005.  *Id.* ¶ 30.  On April 28, 2005, Honda Finance mailed to Bediako a redemption notice telling her that her car would be sold unless she redeemed it by paying any amounts past due under her credit contract.  *See* Defs. Mot. to Dismiss, Aff. Kevin P. Farrell, Ex. 3 Right to Redeem Notice, ECF No. 3-2 at 6-7.  The redemption notice advised Bediako of her right to reinstate the contract if, within fifteen days, she paid the arrearage.  *Id.* at 6.  The notice also identified the exact location where the vehicle was stored.  *Id.*  On the same date, Honda Finance wrote to Bediako and gave her a notice of its plan to sell her property at a private sale.  *See* Defs. Mot. to Dismiss, Aff. Kevin P. Farrell, Ex. 2 Notice of Private Sale, ECF No. 3-2 at 5.  The notice advised Bediako that (1) her vehicle would be sold at a private sale sometime after May 15, 2005, (2) the money received at the sale would reduce the amount owed, and (3) she would still owe any resulting deficiency.  The notice further stated that Bediako should call Honda Finance if she had any questions or needed more information regarding the repossession and sale.  *Id.*

On July 1, 2005, Bediako's car was sold at a private sale, and on August 4, 2005, Honda Finance wrote to her and provided her with a notice indicating that after the sale a deficiency remained of $7,036.80.  *See* Compl., ECF No. 1 ¶ 37-38;  *See also* Defs. Mot. to Dismiss, Aff. Kevin P. Farrell, Ex. 4 Post-Sale Notice, ECF No. 3-2 at 8-9.  After the sale, Honda Finance was unsuccessful in obtaining any voluntary payments from Bediako, either directly or through a debt collector, until 2008 when three payments were received, one in the amount of $275.00 on April

9, another in the amount of $50.00 on May 21, and a final payment of $50.00 on June 17, 2008. Compl., ECF No. 1 ¶¶ 40-45.

### B. *Earlier Litigation*

On May 17, 2010, Honda Finance filed an action against Bediako in the District Court of Maryland for Prince George's County, but that action was dismissed by Honda Finance on October 27, 2010. *Id.* ¶¶ 48-49. At oral argument before this Court on October 13, 2011, Honda Finance represented to the Court that it was abandoning any effort to recover any deficiency from Bediako.

On August 12, 2010, prior to the dismissal of Honda Finance's Maryland District Court action against her, Bediako filed, a "class action complaint" in the Circuit Court for Baltimore County, Maryland, alleging certain procedural irregularities in the sale of her automobile and asserting claims for declaratory judgment, breach of contract, restitution and unjust enrichment and violations of CLEC and Maryland's Consumer Protection Act ("CPA"), Maryland Code, Comm. Law, § 13-101, *et seq.*, law. Honda Finance removed the Baltimore County Circuit Court action to the United States District Court for the District of Maryland, Northern Division. *See* Notice of Removal, Bediako v. American Honda Finance Corporation, Case No. 1:10-cv-02578-JFM (D. Md. Sept. 17, 2010) ECF No. 1.

On September 24, 2010, Honda Finance filed a Motion to Dismiss Bediako's Complaint in the removed Baltimore County action in which it contended that her claims were barred by the applicable statutes of limitations and that the causes of action asserted for CLEC violations, breach of contract, Consumer Protection Act violations, restitution or unjust enrichment and for declaratory relief failed to state a claim. *See* Defs Mot. to Dismiss, Bediako v. American Honda Finance Corporation, Case No. 1:10-cv-02578-JFM (D. Md. Sept. 24, 2010) ECF No. 8. Rather

than to respond to Honda Finance's motion, Bediako filed a Notice of Dismissal on September 26, 2010. *See* Notice, *Bediako v. American Honda Finance Corporation,* Case No. 1:10-cv-02578-JFM (D. Md. Sept. 26, 2010) ECF No. 9.

### C.  The Present Litigation

A little over three months later, Bediako filed essentially the same complaint against Honda Finance in the Southern Division of this Court.[1]  Once again, Honda Finance filed a Motion to Dismiss, asserting essentially the same grounds for dismissal as it had previously asserted in its Motion to Dismiss filed in the Northern Division before that case was voluntarily dismissed by Bediako.

The Court heard arguments on the Motion to Dismiss on October 13, 2011, and now concludes that Bediako's Complaint must be dismissed with prejudice, and the Court need not address or reach her class action allegations.

## II.  Legal Standards For A Motion To Dismiss

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir.1992). "Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal quotation marks omitted).  The complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* "Factual allegations must be enough to raise a right to relief above the

---

[1] A claim for declaratory relief was dropped.

speculative level." *Id.*  The Court "must assume that the allegations of the complaint are true and construe them in the light most favorable to the plaintiff."  *Martin*, 980 F.2d at 952.  In the final analysis, a motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any set of facts which could be provided in support of the claims.  *McNair v. Lend Lease Trucks, Inc.,* 95 F.3d 325, 328 (4th Cir.1996).

Additionally, Rule 12(b) provides that when "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12; *see Talbot v. U.S. Foodservice, Inc.,* 191 F.Supp. 2d 637, 639 (D. Md. 2002) (treating motion to dismiss as motion for summary judgment where the Court had to consider "two items of evidence extrinsic to the pleadings").  However, an exception to the general rule is made for documents which are referred to in the Complaint and upon which Plaintiff relies in bringing the action. *Biospherics, Inc. v. Forbes, Inc.*, 989 F.Supp. 748, 750 (D. Md.1997).  Here, Plaintiff's complaint relies on the RISC contract and the notices sent by Honda Finance.  For this reason, the court may look at these documents without converting the Motion to Dismiss into a Motion for Summary Judgment.

Where the defense of statute of limitations is apparent on the face of the Complaint, the Complaint fails to state a cause of action and a motion to dismiss may be granted.  *Young v. Medlantic Lab. P'ship*, 125 Md. App. 299, 303, 725 A.2d 572, 574 (1999); *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005).

## III.  Analysis

### A.  Timeliness

As noted above, Bediako's Complaint contains four counts:  (1) alleged violation of the Maryland credit grantor closed end provisions (CLEC); (2) breach of contract; (3) violation of the Maryland Consumer Protection Act; and (4) restitution and unjust enrichment.  This section will address the timeliness of each count.

#### 1.  Timeliness of Count One (CLEC) and Count Two (Breach of Contract)

Bediako's retail installment sale contract ("RISC") is a "transaction in goods," a term that is broader than the term "sale of goods."  *Burton v. Artery Co.*, 279 Md. 94, 367 A.2d 935 (1977).  Thus, it is fully subject to the provisions of the Maryland Uniform Commercial Code ("UCC") contained in Titles 1 through 10 of the Commercial Law Article of the Annotated Code of Maryland.  Section 2-102 makes the Maryland UCC applicable to "transactions in goods," and Section 2-725 provides that an action for breach of any contract for sale must be commenced within four years after the cause of "action has accrued."  In *Scott v. Ford Motor Credit Co.*, 345 Md. 251, 254, 691 A.2d 1320, 1322, the Court of Appeals of Maryland held that the CLEC provisions in Title 12 of the Commercial Law Article do not contain any statute of limitations and, accordingly, an action on a contract for the sale of goods that incorporates the CLEC provisions is subject to the four-year statute of limitations set forth in § 2-725.  *Id.* at 1322.

Bediako argues that *Scott v. Ford Motor Credit Co.* should not be interpreted to mean that a consumer borrower's claim for violation of CLEC requirements contained in a retail installment sales contract is governed by the four-year statute of limitations, but rather by § 12-1019 of the Commercial Law Article which provides that "[a]n action for violation of this subtitle may not be brought more than six months after the loan is satisfied."  In Bediako's view,

a credit grantor must bring an action against a consumer borrower within four years after a sale and notice of deficiency, but a defaulting consumer borrower who has never satisfied the loan effectively has *forever* to bring an action against a credit grantor.

It is clear that the Court of Appeals of Maryland concluded in *Scott v. Ford Motor Credit Co.* that CLEC has no statute of limitations. 345 Md. at 254, 691 A.2d at 1322. Bediako's RISC agreement is, as noted above, a contract for the sale of goods that is subject to the four-year limitations period under § 2-725, but it also incorporates the CLEC provisions which, in § 12-1019, bar the bringing of actions more than six months after a loan is satisfied.[2] Hence, there are two separate statutes that address the subject of the timing of the action in this case. As such, they are *in pari materia* and should be construed together to produce a harmonious result. *Turner v. State*, 307 Md. 618, 516 A.2d 579 (1986) (statutes *in pari materia* are to be construed harmoniously, giving effect to the provisions of each); *Ball v. Univ. of Md.*, 137 Md. App. 229, 768 A.2d 105, 106 (2001) (stating that statutes which relate to the same thing or general subject matter, and which are not inconsistent with each other are *in pari materia*, and should be construed together so that they will harmonize with each other and be consistent with their general object and scope, even though they were passed at different times and contain no reference to each other). *See also Montgomery Cnty v. Schultze*, 302 Md. 481, 489 A.2d 16 (1985) (same); *Jamison v. Browning*, 61 Md. App. 405, 466 A.2d 810 (1984) (same).

It would be a most inharmonious result, indeed, if credit grantors were subject to a four-year limitation period, but defaulting consumer borrowers could wait until the arrival of the

---

[2] In *Green v. Ford Motor Credit Co.*, 152 Md. App. 32, 52, 828 A.2d 821, 833 (2003), the Court of Special Appeals observed that § 12-1019 appears on its face to simply set forth a condition precedent to suit.

next millennium to bring suit.  This would be an absurd and outrageous result, and one that the Maryland legislature could not have intended.

Section 12-1019 is not, strictly speaking, a statute of limitations as the Court of Appeals of Maryland observed in *Scott v. Ford Motor Credit Co.*, *supra*.  Rather, it is a "books closing" device that can be analogized to the evolution from "occurrence" to "claims made" policies in certain lines of insurance.  Under a traditional "occurrence" policy, an insurer is obligated to provide coverage for claims that arise at any time within the policy period, and without regard to when the claims are first made.  In some instances, the claim may not be made until many years later.  Unlike an occurrence policy, a "claims made" policy does not provide coverage based on the date of the occurrence of the loss, but rather on the date of the making of the claim.  Claims made policies were designed to allow insurers to "close their books" on possible claims within a reasonable period of time after the close of a policy period, and not be exposed forever to unforeseen claims that might arise many years later.  *See F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1330 (5th Cir. 1994) (explaining that "claims made" policies "are commonly used as professional liability insurance because malpractice by a professional such as a doctor or an architect may not lead to the assertion of a claim until years after expiration of the actual insurance policy … [and these] policies allow the insurer to "close its books" on a policy at its expiration and thus to attain a level of predictability unattainable under standard occurrence policies) (citations omitted).

The differences between occurrence and claims made policies were discussed in the decision of the Supreme Court of New Jersey in *Zuckerman v. National Union of Fire Insurance Co.*, 495 A.2d. 395 (N.J. 1985).  The New Jersey Supreme Court gave a number of reasons why insurers prefer claims made policies, especially in the area of professional malpractice:

8

> (1) claims made policies protect carriers from the "unlimited tail" of the occurrence policy, which permits claims to be made after the expiration of the policy period; premiums on occurrence policies have been typically inadequate since insurers have failed to take inflationary factors into account; (2) occurrence policies have often been disadvantageous to insureds because many underwriters of occurrence policy have gone out of business by the time the claim was made; (3) the "long tail exposure" of occurrence policies is particularly troublesome in medical malpractice, products liability and toxic tort cases, where the latent injury or damage may not become known until years after the policy was written, and where it may be impossible to determine precisely when the relevant damage producing occurrence took place; (4) underwriters issuing claims made policies can calculate risks and premiums with relative exactitude since their exposure ends at a fixed point in time; the ultimate result of this exactitude is comparatively lower premiums, since underwriters issuing occurrence policies will be likely to overcompensate by charging higher premiums as a result of their inability to calculate the risks with precision; (5) claims made policies favor insureds by enabling them to purchase insurance based on current trends and jury verdicts, whereas coverage under occurrence policies may prove inadequate as a result of inflation and unanticipated increases in the size of jury awards (as compared with the time when the policy was issued); and (6) claims made policies stabilize the insurance market.

Kenneth F. Oettle & Davis J. Howard, *Zuckerman and Sparks: The Validity of "Claims Made" Insurance Policies as a Function of Retroactive Coverage*, 21 Tort & Ins. L.J. 659 (1986) (citing *Zuckerman*, 495 A.2d at 399-400). *See generally* James F. Hogg, *The Tale of a Tail*, 24 Wm. & Mary L. Rev. 515 (1998) (discussing the evolution from occurrence to claims made policies).

Viewed in this context, it is clear that the intent of the Maryland legislature in adopting § 12-1019 was to allow a creditor grantor to "close its books" on CLEC transactions once six months have elapsed since the satisfaction of the loan.   The only logical way to interpret harmoniously § 2-725 and § 12-1019 is to conclude that an action under a retail installment sale contract incorporating CLEC provisions alleged to have been violated must be brought by either party against the other no later than the first to occur of six months after the loan is satisfied or

four years after a CLEC violation is alleged to have occurred.   Applying the statute in this manner leads to the inescapable conclusion that Bediako's claim should have been brought within four years of July 1, 2005, the date of the allegedly deficient sale of her car.   Because this action was brought substantially longer than four years later, her claims under Counts 1 and 2 are time barred.[3]

### 2.  Timeliness of Count Three (Maryland Consumer Protection Act)

In Count Three, Bediako asserts a claim for an alleged violation of the Maryland Consumer Protection Act.   However, claims under the Maryland CPA are subject to the three-year general statute of limitations contained in § 5-101 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland.   *Greene Tree Homeowners Assn. v. Greene Tree Assocs.*, 358 Md. 453, 482, 749 A.2d 806, 808-11 (2000).   The gravamen of Bediako's CPA claim derives from Honda Finance's alleged CLEC violations and the communications from Honda Finance to Bediako concerning the sale and resultant deficiency.   Assuming, arguendo, that CPA claims derivative of CLEC violations can be asserted, they nevertheless are time barred because the Plaintiff knew, or reasonably should have known, that she had a cause of action by no later than the August, 2005 notice of the sale of her vehicle.

### 2.  Timeliness of Count Four (Unjust Enrichment)

In Count Four of her Complaint, Bediako asserts damage claims for restitution and unjust enrichment.   It appears that this count is asserting a claim for the tort of unjust enrichment as a

---

[3] The three payments made by Bediako in 2008 do not change the analysis.   The wrongs of which she complains occurred at the time of the sale of her car in 2005. The payments made by her in 2008, assuming a viable claim based on CLEC violations, are simply damages flowing from the wrong occurring in 2005, and do not result in a new limitations period. *See Hood v. Aurora Loan Services*, 2010 WL 2696755 at *3  (D. Md. July 6, 2010) (holding that Plaintiff's claims under federal and state law against home lender was time-barred where Plaintiff's claim stems from allegations that home lender wronged him at the time they entered into the mortgage agreement).

result of the collection by Honda Finance in 2008 of amounts to which it allegedly was not entitled. The tort of unjust enrichment contains three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Berry & Gould, P.A. v. Berry,* 360 Md. 142, 151, 757 A.2d 108, 113 (2000).

As a recognized tort cause of action, it is fully subject to the general statute of limitations contained in Section 5-101 of the Courts and Judicial Proceedings Article of the Annotated Code of Maryland. While at first blush this claim might appear to be timely because payments were made by Bediako less than three years prior to the institution of this action, the problem for Bediako is that her unjust enrichment claim is derivative of a time-barred CLEC violation, and it would be a strained statutory construction to conclude that a claim derivative of a time-barred claim is not also time barred. The Court need not, however, rely solely upon this conclusion to dismissing Count 4 because, as the Court concludes below, there is not a CLEC violation, but even if there were, the payments recovered by Honda Finance were well below this threshold of non-recoverability under CLEC.[4]

### B. The Merits of the Plaintiff's Claims

Plaintiff's claims also fail on the merits for two reasons. First, under the principle of *damnum absque injuria*, a plaintiff cannot recover absent an injury and, here, Bediako suffered no injury. Secondly, Plaintiff cannot recover because Honda Finance complied with the notice requirements of CLEC. Because Plaintiff's Breach of Contract, Maryland CPA, and Unjust Enrichment claims are all derivative of her CLEC claim, these claims also fail.

---

[4] *See infra* Section B.1

### 1. The Principle of *Damnum Absque Injuria*

A transcendent problem for all of the Plaintiff's claims is that her case appears to be classic one of *damnum absque injuria* (wrong without any injury).  Where the wrong complained of has not resulted in any prejudice or damage to the Plaintiff, the wrongs are properly classified as *damnum absque injuria*.  *Central Cab Co. v. Clarke*, 259 Md. 542, 270 A.2d 662 (1970) (even if attorney violated a duty owed to a client, there can be no recovery for legal malpractice absent a demonstrated injury to the client); *Shipley v. Meadowbrook Club, Inc.*, 211 Md. 142, 126 A.2d 288 (1956) (wrongful taking of a promissory note was *damnum absque injuria* since the note was concededly barred by limitations); *Mid-Century Ins. Co. v. Hutsel*, 10 Cal. App. 3rd 1065, 1070 (1970) (where a plaintiff has suffered no actual detriment by the defendant's alleged wrong, plaintiff's damage is *damnum absque injuria*); *Kopperl v. Bain*, 2010 WL 3490980 (D. Conn. August 30, 2010) (defendant's conduct is not actionable unless plaintiff pleads and proves that plaintiff's conduct caused him damage); *Hendricks v. DSW Shoe Warehouse, Inc.*, 444 F.Supp. 2d 775, 780 (W.D. Mich. 2006) (a breach of contract claim must be rejected where the breach, if any, is "*damnum absque injuria.*")

Section 12-1018(a)(2) contains a general "Civil Penalty" provision for *any* violation of CLEC that states "[e]xcept for a bona fide error of computation, if a credit grantor violates any provision of this subtitle the credit grantor may collect only the principal amount of the loan and may not collect any interest, costs, fees or other charges with respect to the loan."  In a separate section related to repossessions, section 12-1021(k)(4) provides that if the credit grantor violates the sale notice provisions, "the credit grantor shall not be entitled to any deficiency judgment to which he would be entitled under the loan agreement."

No matter how one calculates the effect of the repossession and private sale of Bediako's vehicle, there is simply no way that she suffered any actual damages.  The RISC indicates that the principal amount Bediako owed was $16,234.75.  *See* Defs. Mot. to Dismiss, Aff. Kevin P. Farrell, Ex. 1 RISC Contract, ECF No. 3-2 at 3.  Bediako was to begin making monthly payments of $359.06 on May 18, 2004.  *Id.*  Bediako's car was repossessed on April 28, 2005. *See* Compl., ECF No. 1 ¶ 30.  Assuming that Bediako made all of her monthly payments between May 18, 2004 and April 28, 2005, and that all of these payments, totaling $4,308.72, were applied towards the principal, Bediako still owed $11,926.03 in principal.  The post-sale notice indicates that the vehicle was sold for $7,900.00.  *See* Defs. Mot. to Dismiss, Aff. Kevin P. Farrell, Ex. 4 Post-Sale Notice, ECF No. 3-2 at 8.  Assuming that the proceeds from the private sale ($7,900.00) were also applied to the remaining principal ($11,926.03), Bediako still owed $4,026.03 of principal.  In other words Bediako still owed over $4,000 exclusive of fees and costs *before* Honda Finance collected the three 2008 payments totaling $325.00— i.e. the payments that supposedly violated Section 12-1021(k)(4).  Even if this Court were to apply the $325.00 collected by Honda Finance in 2008 to the remaining principal of $4,026.03, $3,701.03 of principal remains on the loan.

Thus, there can be no injury from Honda Finance's alleged failure to follow the disclosure obligations because Honda Finance at oral argument affirmatively waived its right to recover any deficiency.  The private sale of her vehicle did not produce enough to repay the principal, even if the principal amount of her loan were credited with the full amount of the three payments that she made in 2008.  Thus, even if there were a CLEC violation (which Honda Finance does not concede), the credit grantor here has not recovered the outstanding principal, much less any deficiency.  Accordingly, Bediako's CLEC claim and all remaining claims based

on the alleged CLEC collection violation, including Plaintiff's Breach of Contract, are not

actionable because Bediako did not sustain any damages.

### 2.   CLEC Notice Violations and Derivative Breach of Contract, Maryland CPA, and Unjust Enrichment Claims

#### a.   Count One:  The CLEC Violation Claim

Honda Finance sold Bediako's used car at a private sale.  In her Complaint, she contends

that Honda Finance violated the CLEC provisions by failing to provide her with a notice giving

the exact location, time and date her car would be sold.[5]  *See* Complaint, ECF No. 1 ¶ 69.  To the

---

[5] The CLEC provisions governing sales of repossessed property are contained in § 12-1021(j) of the Commercial Law Article and read as follows:

(j)(1)(i) Subject to subsection (l) of this section, the credit grantor shall sell the property that was repossessed at:

   1. Subject to paragraph (2) of this subsection, a private sale; or
   2. A public auction.

(ii) At least 10 days before the sale, the credit grantor shall notify the consumer borrower in writing of the time and place of the sale, by certified mail, return receipt requested, sent to the consumer borrower's last known address.

(iii) Any sale of repossessed property must be accomplished in a commercially reasonable manner.

(2) In all cases of a private sale of repossessed goods under this section, a full accounting shall be made to the borrower in writing and the seller shall retain a copy of this accounting for at least 24 months. This accounting shall contain the following information:

   (i) The unpaid balance at the time the goods were repossessed;
   (ii) The refund credit of unearned finance charges and insurance premiums, if any;
   (iii) The remaining net balance;
   (iv) The proceeds of the sale of the goods;
   (v) The remaining deficiency balance, if any, or the amount due the buyer;
   (vi) All expenses incurred as a result of the sale;
   (vii) The purchaser's name, address, and business address;
   (viii) The number of bids sought and received; and
   (ix) Any statement as to the condition of the goods at the time of repossession which would cause their value to be increased or decreased above or below the market value for goods of like kind and quality.

(3) The Commissioner of Financial Regulation may make a determination concerning any private sale that the sale was not accomplished in a commercially reasonable manner. Upon that determination, the Commissioner may enter an order disallowing any claim for a deficiency balance.

extent that Bediako's CLEC violation claims are not barred by limitations or the principle of *damnum absque injuria*, they are without merit.

In his opinion in *Scott v. Nuvell Financial Services, LLC*, 789 F.Supp.2d 637 (D. Md. 2011) rendered on June 7, 2011, Judge J. Frederick Motz of this Court explained the fundamental differences between public and private sales under the provisions of Md. Com. Law § 12-1021(j), and especially the significance of the post-sale disclosure requirements applicable only to private sales.

In *Scott v. Nuvell Financial Services*, Plaintiffs, vehicle owners, filed suit against their creditors after the vehicles were repossessed alleging that these creditors "failed to comply with CLEC's notice and accounting requirements applicable to private sales and are therefore barred from collecting any alleged deficiency balance." *Id.* at 641. The Court emphasized that the "critical question" is whether the manner in which the repossessed vehicles were sold amounted to public or private sales. *Id.* The court reasoned that a public sale only requires a "post-sale disclosure to consist only of a written statement to the borrower detailing how the sale proceeds were distributed" whereas a private sale "implicates a number of additional disclosure requirements, including the purchaser's name and address, the number of bids sought and received, and any information about the vehicle's condition at the time of repossession that would cause its value to differ from the market value for goods of like kind and quality." *Id.* The reason for this difference is that public sales, or auctions, are subject to open, public competitive bidding, thus making the additional disclosure requirements governing private sales unnecessary. *Id.* at 644.

From a fair reading of § 12-1021(j), aided by the excellent analysis made by Judge Motz, several key conclusions can be reached:

First, a credit grantor may sell a repossessed vehicle either at a private sale or at a public auction.

Second, a private sale, by its very nature, is not one that takes place in an open auction-like setting, but typically is accomplished privately by the receipt of bids that are received over a period of time in writing or other form of communication.  Thus, there is no real "time, date and place" in the case of a private sale at which a defaulting borrower could attend, participate and monitor the public bidding process.  All that is important for the protection of the vehicle owner in the case of a private sale is notice of the last date by which his or her vehicle can be redeemed.

Third, both types of sales are required to be conducted in a commercially reasonable manner, but more detailed post-sale disclosure requirements are imposed in the case of private sales.  The obvious purpose of the post-sale disclosure requirements in the case of a private sale is to assure that the private sale was, indeed, conducted in a commercially reasonable manner.[6] In the case of a public auction, however, the commercial reasonableness of the process is virtually inherent in the nature of a fairly-conducted public auction, and the General Assembly did not impose the detailed post-sale disclosure requirements contained in § 12-1021(j)(2) applicable to the case of private sales.

Thus, § 12-1021(j), does *not* require compliance with the "date time and place" notice requirements of § 12-1021(j)(1)(ii) in the case of private sales; rather, private sales are subject to the requirement that they be conducted in a commercially reasonable manner as mandated by § 12-1021(j)(1)(iii), and with detailed post-sale disclosures.  As an added protection in the case of private sales, § 12-1021(j)(3) authorizes the "Commissioner of Financial Regulation to make a

---

[6] The legislative history of CLEC confirms that the reason that Maryland imposed additional post-sale disclosure requirements on private sales is "to prevent [a] favored buyer… that [is] not 'bona fide' (commercially reasonable)" from purchasing the vehicle below the market price.  See Legislative History of S.B. 839, 1987 Leg. Sess. (Md. 1987).

determination concerning any private sale that the sale was not accomplished in a commercially reasonable manner."[7]

The notice given to Bediako of Honda Finance's intended sale of her car advised her that it would be a private sale and that it would take place sometime after May 15, 2005. Since it was not to be a public auction sale but rather a private sale (conducted in most cases behind closed doors), there would be no point in giving a date, time and location of a sale. This point was underscored in an opinion authored by Judge Ellen Hollander (now a judge of this Court) in which the Court of Special Appeals in *Gambo v. Bank of Maryland*, 102 Md. App. 166, 176, 648 A.2d 1105, 1109 (1994), explained that in the context of comparable provisions governing disposition of collateral after default, Section 9-610 (formerly Section 9-504) of the Maryland Uniform Commercial Code requires "reasonable notification of the time and place of any public sale or *reasonable notification of the time after which any private sale* or other intended disposition is to be made shall be sent by the secured party to the debtor" because such notice gives the debtor (1)"an opportunity to exercise the right of redemption of the repossessed collateral;" (2) "the chance to challenge any aspect of the disposition before it is made;" and (3) the opportunity to seek out persons who might be interested in In purchasing the collateral") (emphasis added). Time and place notification in the case of a private sale would be meaningless and nonsensical. All that is necessary, and what was done here, is to give the vehicle owner notice of the date after which the private sale would be completed. Accordingly, Honda Finance's notice of the intended sale fully complied with the requirements of CLEC. Finally, Honda Finance's prompt post-sale notification fully complied with the post-sale disclosure requirements applicable to private sales set forth in § 12-1021(j)(2).

---

[7] It does not appear that Bediako took advantage of this complaint process.

Accordingly, the Court concludes that Honda Finance fully complied with all applicable CLEC provisions when it conducted the private sale of Bediako's car and, to the extent that her claim is not barred by limitations or the absence of any damages, it is insufficient as a matter of law.

### b.  Count Two:  Breach of Contract

Count Two of Bediako's Complaint asserts that the RISC was violated because it incorporated the CLEC provisions and, in turn, the CLEC provisions were violated.  Because the Court has concluded that the alleged CLEC violations are untimely, lacking any damage, and insufficient as a matter of law, Bediako's breach of contract claim asserting violations of CLEC fails as well.

### c.  Count Three:  Consumer Protection Act

In Count Three, Bediako asserts a violation of the Maryland Consumer Protection Act which, as noted above, is entirely derivative of Bediako's CLEC violation claim.[8]  As with Counts I and II, Count III also fails as a matter of law to the extent that it is not time barred and deficient because of the absence of any injury.

### d.  Count Four:  Restitution and Unjust Enrichment

Finally, Bediako asserts a claim for restitution and unjust enrichment premised upon the same CLEC violations serving as the basis of the prior three counts.  Because the Court concludes that the prior three counts are barred by limitations, defeated by the absence of any injury and utterly without merit, this claim must fail as well.

---

[8] CLEC violations are not "*per se* violations of the [MCPA]."  *Pittman v. Alright Mortg. Co.*, 165 B.R. 586, 590 (Bankr. D. Md. 1994); *DeCohen v. Abbasi, LLC*, 2011 WL 3438625 at *4 (D. Md., 2011).

**Conclusion**

For the foregoing reasons, the Court will, by separate Order, grant the Defendant's

Motion to Dismiss and dismiss the Complaint with prejudice.


Date:  March 28, 2012                          _____/s/_____
                                               Roger W. Titus
                                               United States District Judge